Good morning, all. Our first case for argument this morning is EEOC v. Flambeau. Counsel? Good morning. May it please the Court. My name is Anne-Noelle Acalino, and I represent the EEOC as appellant. The EEOC brought this lawsuit under Subchapter 1 of the Americans with Disabilities Act, alleging that Flambeau violated Subchapter 1, specifically 42 U.S.C. 12112-D4A, which contains a general prohibition on requiring employee medical exams or disability-related inquiries when it told its employees that if they wanted to enroll in the company's health insurance plan, they had to complete a wellness plan, which included a blood draw, and answer a health risk assessment form, which asked questions about their medical status and family history. We specifically argue that this violated the statute because the statute contains just two exceptions for employee medical exams and disability-related inquiries. One for job-related or consistent with business necessities, which Flambeau has never alleged here, or the second for voluntary wellness plans, and we allege that here, this was not voluntary. The District Court, however, never reached what we viewed as a critical issue in this case, which is whether the wellness plan was voluntary. Instead, the District Court ruled that a separate section of the ADA under Title V of the Act, the so-called insurance safe harbor provision, gave safe harbor to Flambeau's plan. Respectfully, we disagree. In our view, the Court erred for a number of reasons. First— So, before you dive into the merits, could you tell us what relief you would be seeking if we were to remand? I think that there is still relief here, and I assume Your Honor's question gets to the fact that Flambeau has abandoned the mandatory component of its wellness plan. And that Mr. Arnold has apparently retired. Mr. Arnold no longer works for the company, but I believe that there still would be damages because for a period of time, he was without any health insurance for several months between January 2012 and May 2012 when his insurance was reinstated. After he had paid the back premiums and undergone the wellness plan. And what would his damages be? I think he might have had some out-of-pocket expenses. I think that part of his— You think? Yes. Your Honor, the District Court's decision didn't get into this argument that you're raising about whether— No, it has to do with whether we have jurisdiction to decide this. I believe that you would have jurisdiction to decide because Flambeau has never conceded that its plan was— Go ahead. Has never conceded that its plan was not lawful. So it's still a question for this Court about whether he might have had damages from the time that he was without any insurance at all. Are you depending on the EEOC regulation? I am. If I may— I'm sorry. I didn't mean to interrupt you. Just to follow up, kind of blend in what he's talking about. Go ahead. We do rely on the regulation. And I assume you mean the regulation that became effective this summer when we amended the regulation to talk about specifically what kind of incentives an employer can use when it has a wellness plan. And our argument is that Flambeau's plan was not voluntary under either our old definition of what voluntary means or under our more specific definition in the regulation. Prior to the regulation, we had defined voluntary, which is a term from the statute, to mean that participation is not required and there's no penalty. That was in our compliance manual and interpretive guidance. Our regulation gets more specific and says that voluntary means you can't require participation, you cannot cut off somebody's access to health insurance plan if they refuse to do a wellness plan, and you can't retaliate, threaten, coerce, or intimidate an employee. There's one provision of our new regulation that we're not relying on here because it's not effective yet, and that concerns the incentive, monetary incentives that an employer can offer, which gets pretty complicated. But the incentive or the penalty that's permissible is 30% of the cost of a self-insured plan. But that part becomes effective January 2017, and we explain that in our reply brief. But we do think the central question in this case is and always should have been whether – I'm sorry, I'd like to go back to whether we have jurisdiction. I gather this issue has not really been addressed, but unless Mr. Arnold would have damages, what relief would be available at this point? I suppose we get declaratory relief to declare that it's unlawful. No, that's not enough by itself. If the plan has been canceled for reasons independent of the lawsuit. But then, Your Honor, I think I would have to submit extra briefs to this court to address your specific point in more detail about whether we have jurisdiction, whether this court has jurisdiction over the suit. Well, if there's no damages, aren't you asking just for an advisory opinion? If there were no damages at all and we can't seek declaratory relief, I guess so, Your Honor. But I don't think it's clear in this record that there weren't any damages. It's your burden to establish jurisdiction and that this is not moot. And Mr. Arnold may also be able to get compensatory damages for the period that he – Was that for emotional distress for not having coverage? I think that he could obtain that, Your Honor. And is that why we're here? Yes, and I'll say it is why we're here. Well, seriously, look, an awful lot of effort has gone into this lawsuit by both parties, by friends of the court who have tried to turn this into a big issue. But if this is all about Mr. Arnold's distress without any out-of-pocket damages for several months, I understand it's real. Nobody wants to be without health insurance.  But this looks like much ado about ancient history, particularly now that your new regulation is in place. Although I think that if Mr. Arnold isn't held to compensatory damages, then there would be still something for this court to decide. And I understand your reluctance to wade into a complicated issue, but as you say, there are many parties that are very interested in this case and the outcome from this court because wellness plans are such an important part of the employer landscape these days. Well, the commission might have focused on a case with little facts that might have sharpened the issue, right? I mean, you're a nationwide operation, it seems to me. You might have been able to come up with someone that you were concerned about in addition to... Well, we're driven by the charges that we receive. And we received this charge from Mr. Arnold, and we investigated it, and we found cause. Is this the only voluntary issue or compulsory issue, however you want to phrase it, that the commission received during this time period? I don't know specifically. We do have another lawsuit pending called Orion Energy, which raises similar issues with the lawfulness of wellness plans. In this circuit? It is out of Wisconsin. Then it would be our circuit. It would be your circuit. I'm not convinced that this court lacks jurisdiction, although I apologize for not being prepared specifically to answer your questions about exactly what Mr. Arnold's damages were. But Flambeau has never raised that. Counsel, come on. I mean, this is jurisdiction. And the briefs disclose that the plan has been canceled and that he no longer works there. So injunctive relief seems to be off the table. But if there is some monetary relief that he has or compensatory relief, then it would be appropriate for you to still decide the case. I interrupted before, and I'll go back to the regulation. But it's all based on – I totally agree with all those questions. But also the regulation, one of the MECAS briefs points out that why EEOC? Why not Health and Human Services, Labor, or Treasury? It seems to me, what's EEOC that entitles you to Chevron deference, for example? I think that it is true that many agencies have an interest in wellness plans. They didn't express any, though. That's what I'm wondering. Well, our interest in wellness plans comes from subchapter 1 of the Americans with Disabilities Act, which says that employee medical exams and inquiries are unlawful unless job-related, or they are voluntary exams and voluntary inquiries as part of an employee health program. So that's where our interest comes and our authority comes. Because under 42 U.S.C. 12116, we have the authority to issue substantive rules under the Americans with Disabilities Act, subchapter 1. So I think that it's incorrect to say that the EEOC has no authority from Congress to be interested or to offer a viewpoint about the lawfulness of wellness programs. We have to reach for it, though, right? It doesn't jump out of some statute, right? I'm not sure that you have to reach so much because subchapter 1 uses voluntary and wellness plans. We're charged with implementing that part of the Americans with Disabilities Act, so we have to inform employers about what voluntary means, which is why we enacted our regulation from this summer, because employers really wanted more detail in employees about what voluntary means. And so we tried to harmonize our lane of traffic to interpret wellness plans with what other parts of the government had done in interpreting HIPAA and the Affordable Care Act. And that's how we came, again, we're deep into the weeds, but to the 30 percent financial limit for penalties or rewards to make that jive with what HIPAA and the Affordable Care Act state. So we tried to be cognizant of the fact that we're not the only ones with an interest here. How did we arrive at that 30 percent figure? That 30 percent figure comes from HIPAA and the Affordable Care Act because their 30 percent figure attached to health plans that had a specific health outcome. So you might have seen it. You just adopted it. Yes. Yes, we tried to make it the same and not make it too confusing for employers, and some groups are not very happy that we allowed even up to 30 percent. I don't think that this case raises, if you get there, whether that 30 percent limit is permissible or not permissible because Flambeau's wellness plan plunks the voluntary test even without that. I could talk more about that, about whether it's voluntary, or if this Court would like to hear more of our argument about why we think the insurance safe harbor doesn't apply, if you get there, then I could address that. Well, I think you should address the safe harbor issue. So our view is that, based on the plain language of the statute, the context and the legislative purpose, the insurance safe harbor doesn't apply. It's in a separate provision of the Act. Congress addressed comprehensively at 12112D4A when employers were allowed to do exams and disability-related inquiries. We think the legislative history is very compelling in this case. There's only one part of the history in the House report where they talked about wellness plans, and they acknowledged that many employers use wellness plans now, back in 1990, and said that's permissible so long as they're voluntary and the information is kept confidential. So there was no hint that Congress understood that the insurance safe harbor would create essentially a third exception to the general prohibition on exams and inquiries. Well, your position is, though, that if you're not required to take the company plan, which has a wellness component, it still can't be voluntary, right? Yes. The fact that you can get insurance outside. Correct. And another carrier. Yes. Your position is that inherently is not voluntary. Yes. To tell somebody that their access to health insurance will be cut off, even if they could get it elsewhere, that that's not voluntary. And presumably they would also be denied it. Well, let's not say cut off. Let's say you're a first-day employee and you're offered a package with wellness or not. It doesn't condition employment at Acme Manufacturing. It doesn't condition employment. That's definitely not our argument. Right. But on that first day, it's an involuntary choice, you're saying. Yes. To join our program, which requires wellness, as opposed to going to a carrier, a separate carrier. Correct. In fact, that is our view, and that's been our longstanding view. I think we've expressed it fairly clearly in interpretive guidance, but now it's absolutely crystal clear in 1630.14d6, a regulation that was enacted this summer, that that is a violation. So even if this court disagrees with us about the applicability of Insurance Safe Harbor in general, we think that we should win through the application of the Insurance Safe Harbor. Again, that's getting to voluntary. We think that we should win here because we don't believe that Flambeau was engaged in underwriting risk, classifying risk, or administering risk. How do we determine that? I mean, do we have to examine what their overall insurance program would require of them by way of premiums, unless they had the program? How do we determine that they are not about genuinely trying to improve the health conditions for the reasons that are allowable under the Safe Harbor? Well, to determine whether they're underwriting, classifying, or administering risk, which I think is pretty complicated, you look at the statute, the statute doesn't define those terms. Right. We tried to fill in the gap, and we said, based on legislative history, that underwriting, classifying, and administering risk is all getting the same thing. It's using risk classification or grouping of risk to make determinations about coverage, eligibility, benefits, or premiums. And we cited this case, Doe decision, which talks about actuarial risk and underwriting. The Rouse decision from the D.C. Circuit that talks about underwriting as a process of looking at risk factors when there's an application for insurance and making coverage determinations. So was Flambeau actually using individual risk factors or group risk factors for premium rates to determine who to cover, to determine what benefits individuals were getting? And the answer here is no. They have the burden here, and I think they failed to meet their burden of showing that. Well, their witness, Reland, apparently didn't help them on that issue, but I thought that the testimony from their consultant suggested that they were using this for setting premiums. Sarah Hames, I believe, is who you're referring to, and her affidavit, I think, is not always very clear. But there's just two things I'd like to point out, even about her affidavit. Because one of Flambeau's arguments is we used her recommendation to purchase stop-loss insurance, but the decision to purchase stop-loss insurance, the recommendation was based on data from the fall of 2010 when the plan was not mandatory. We're not challenging that. Another recommendation that they made was to charge smokers a higher premium rate, but as we pointed out in our brief, that recommendation, and you can get this from reading Paragraph 7 and 8 of her affidavit, that recommendation was based on data from the fall of 2010. So Flambeau wasn't using it to purchase stop-loss insurance, which we also believe is not actually underwriting. Stop-loss insurance protects the employer against a catastrophic loss based on individuals or the aggregate group. As for the premium rates for the benefit year 2012, you're correct. Mr. Reland testified at pages 71 to 72 of his deposition two or three times. We did not use that data to set premium rates. For the 2012 year, at least, at a minimum, there's a question of fact. But I think if you look at Sarah Haines' affidavit also, it seems pretty clear she's agreeing. They didn't set 2012 rates on the mandatory wellness plan. So maybe you can get from Sarah Haines' affidavit that they used it to set rates for the next benefit year, but it's pretty unclear. The other things that the district court thought constituted underwriting, because the district court adopted an incredibly broad definition of underwriting and said it has anything to do with the process of developing an insurance plan. And respectfully, that's not the language of the insurance safe harbor. But besides the smokers, stop-loss insurance, the court said, well, they also used the recommendation to charge less for preventive medications and to cover all preventive health exams. But that is not using risk factor to make individual determinations about coverage or premium rates. That's a generic recommendation, how to make your employees healthier, with what is a laudable goal, which is to reduce health care costs. Would we be creating a circuit split here with the 11th? With the 11th circuit? Your Honor, the 11th circuit decision addressed only one issue, and that was term. Was the wellness plan a term of the insurance plan? So would you be creating a circuit split if you agreed with our argument about term? I believe that you would because in many key ways their plan was similar to the plan here. I'm not sure that's correct, but we'll talk about that with counsel. Did the commission seek relief on bonk in that case or petition for cert? We were not a party in SAF, so no, we did not. You were an amici in that case? No, we did not file an amicus brief. It's one of the challenges for the EEOC, right? People litigating your statutes all over the place. That is true, but we do believe the 11th circuit was wrong about term and what it means. I mean, in that case, even the county's HR person said, oh, no, this is not a term of our health insurance plan. So it's a little bit hard to understand that decision. And also the 11th circuit said, well, the plaintiff didn't cite any authority saying that the term, the wellness had to be part of the health insurance plan description. But there's no authority either way. That was a county plan, though, not subject to ERISA, was it? It was a county plan, so it was under C-2. It was not a self-funded plan under ERISA. I think that's correct. It wasn't subject to ERISA at all, was it? No. State or local government? I believe not. So Glenbow's plan is different that way. So provisions about amending plans under ERISA, for example, didn't apply there, and they would apply here. That's true, Your Honor, and we could talk more about the difference between C-2 and C-3. This case, as you seem to know, was litigated under C-2. C-3 is the part of Insurance Safe Harbor that deals with self-funded plans that are covered by ERISA. And that's not an argument that Glenbow raised until now, but we think that it can't carry them across the finish line because C-3, we can argue, was also meant to get at underwriting risk, classifying risk, and administering risk, which we don't believe the company's wellness plan was aimed at doing.  Yes, thank you. All right. Counsel? Good morning, judges. I may please the court. I'm pleased to be in the courtroom this morning on behalf of Appellee Flambeau, Inc., and I, on behalf of Flambeau, respectfully urge this court to affirm the district court's well-reasoned decision in this matter. So if there's any question I'm well-equipped to answer today, it's the one that was raised about jurisdiction, because my client has asked me many, many times, why is this case being pushed? Why is it being pushed? It is a program that, as was pointed out, was suspended a couple years back for reasons wholly unrelated to this case. The company just decided to put some of their health care wellness plan dollars into a different program. I took Mr. Arnold's deposition, and I was equally befuddled as to why this case was the one chosen to be pushed, because when I asked him about emotional distress at his deposition, there was no evidence, no testimony supporting emotional distress. As far as out-of-pocket, it was nominal. Are there some damages here? Is that enough to confer jurisdiction? They were extremely nominal. My recollection is less than $1,000. And he did get back on the program, and once he was back on the program he continued with the company for, I want to say about a year and a half, and then decided to retire his employment. When he was reinstated, was the insurance reinstated retroactively to cover those out-of-pocket expenses? The insurance was reinstated back. He had to pay back premiums. He had to pay back premiums, and that insurance should have covered the less than $1,000 that he incurred during that two-and-a-half-month period. If the insurer is collecting the back premiums, then presumably. Exactly. That's exactly right. So my client has said to me over and over, why is this case getting pushed? Why was it pushed in the lower court? And then when we got the decision from Judge Crapp, we presumed or hoped, I guess, that that would be the end of it, again, given the facts and circumstances. But the EEOC certainly has the right to push it into this court, and here we are today. But I do think jurisdiction is a significant issue here. As I was sitting at a council table listening to the questions and the EEOC's responses, there's a phrase that just sticks with me in this case, and it's a phrase that we hear regularly in the presidential election right now. Words matter. Words do matter. And the ADA is a very important lawsuit. In fact, when Flambeau set up its wellness program with the testing requirements and the HRA completion, they did so purposely in a way to honor the ADA. They did not set it up in a way that they would get any individual information on medical or HRA information from the employees. It went to a third party. The only data that my client received was aggregate data, and that aggregate data was used to administer risk. I go back to the HRA for a minute. What is an HRA? It's a health risk assessment. The safe harbor here is all about risks, and although the EEOC is trying to write out the underwriting part of the statute and sort of ignore the classifying and administering part of the safe harbor, they exist. Words matter. And for the EEOC to basically make the argument that the safe harbor doesn't apply to the wellness program, that is going against the plain meaning of the statute. Well, we've just been told that the data that was used was from different years. Yeah. When the program was not in place. What evidence are you relying upon to show that at the relevant time, data was used for your notion of underwriting? I think that, and this is a little bit nuanced, but what Mr. Reland testified to was that the information from the testing that was conducted in, I believe it was 2011, was not used for 2012. But he went on to say that the, it's sort of a question of timing, actually. There is testimony that some of the information that was used or was gathered, excuse me, was used to set a future premium. It wasn't used for that year, but it was used in future years. Is this aggregate that you're talking about, is that what it was? Is it trying to get some sort of a measure just out of the cross-section of people? That's exactly right, Judge. And just out of curiosity, did the people who had various tests, it's supposed it's not disclosed, et cetera, but did individually could they have asked to see that test result? I don't recall anything from the record of individuals specifically asking to see it, but could they have seen it? Absolutely. One of the reasons that Flambeau set up this wellness program, they viewed it as a win-win, to be perfectly frank, Your Honor. They viewed it as it would provide the employees with information, confidential information, that the company would never have access to about their wellness. And whether it was high blood pressure, obesity, whatever was found through the blood testing and so forth, that was for the employees to use, which is a positive. Now, was it a win for the company as well? Absolutely it was a win for the company as well, because the company could then take that information and use it to, and they did use it, by the way, to address premiums, stop-loss, and not just stop-loss in a certain year, which is what the EOC attorney just argued, but also whether to continue stop-loss in future years. So they used that information in an effort to try to address and limit their health insurance risks. It is a self-insured program here. Where was that information kept? Was there a separate file for each employee? It's not kept at Flambeau at all. It's kept with the third-party administrator, Hayes. There were two third-party administrators that the company worked with, one in formulating the plan and one in actually collecting the data and holding it. That's where it was held. That third-party administrator, Hayes, would then send an aggregate report to Flambeau, and then Flambeau actually used that information in administering risk. Again, under the safe harbor, that's one of the three. And how do they administer risk? They took information, for example, that a certain percentage, a high percentage of the workforce was obese, and they began weight loss clinics. They changed the selections in the vending machine. They brought in physical, or not physician's assistants, but medical coaches to help the employees. And also keep in mind that the tobacco information was gathered during this process. Whether or not somebody used tobacco was specifically gathered, and that was directly used in the underwriting of risk. Because if somebody was a tobacco user, their premiums went up. That's as direct as you can get in regard to an insurance setting under the safe harbor. So in regard to the tobacco use, which was part of this program, it was used to underwrite risk, they classified risk, and Flambeau also administered risk. The safe harbor is met on all three prongs in that regard. Can we talk about another prong of both safe harbors? Sure. I gather the safe harbors here were something of an afterthought. They were not part of the company's response to the original EEOC charge, correct? That is correct. And my concern is with the issue of whether this requirement to submit to examinations was a term of a bona fide benefit plan. I assume your plan is subject to ERISA, right? That's correct. Okay. And ERISA's 402B3 is a provision that requires plans to provide a procedure for amending such plan and for identifying the persons who have authority to amend the plan. I don't see any indication in our record here that any amendment was adopted to the plan to require physical exams as a condition of being insured. That is correct. It was not specifically in the plan documents, the SBD. Okay. So now the ERISA problem didn't arise in SEF before the 11th Circuit at all. Correct. So I'm very troubled by the notion that an employer can, at least the evidence here, looks like a few PowerPoint slides and presentations to employees, right? I think it went a little bit beyond that. Brochures? What's that? Brochures? Correct. They were brochures. But there's no plan amendment, and since we usually are very reluctant to allow plan amendments in informal ways or based on estoppel when it's the employee asserting there's been an amendment, I'm very troubled by the notion that this would qualify as a kind of improvised plan amendment without going through the formalities. On that issue, one determination that the district court made I think is very valuable to that point. The EOC is basically arguing here that the participation in the wellness program or the testing and the HRA risk was mandatory. It was mandatory. If that position, which the EOC has said numerous times, is accurate, then as the district court noted, that's a compelling argument that it has to be a term of the plan. So that's one issue. Second issue is the SPD, the summary plan description, and the collective bargaining. I want to ask you about that in a moment, but okay, go ahead. But the SPD, while it doesn't specifically reference wellness programs, there is some language in the SPD, and I was trying to find it and I can't, but my recollection is it's something along the lines of that employees must participate in the plan in measures that the company basically requires. And because that is in the SPD, it's a catch-all, I will give you that. It's pretty vague, and this is a big deal. I understand. It's a big term if you're going to subject people to a blood draw, where presumably you can get an awful lot of information about somebody out of a blood draw. I totally agree. But at the same time, there were brochures, there were information sessions in which the employees were specifically told that this is a mandatory part to participate in the plan, and if it's mandatory, which, again, even though it's mandatory, the whole voluntary issue comes into play, but that's where the safe harbor protection comes in. But if it's part of their requirement to participate in the plan, I would think, as the district court noted, that would make it a term of the plan. Who made the change? ERISA requires you identify people, individuals, who have the authority to make that change, and given the way you framed your summary judgment motion, there's no record on any of that, as far as I could tell. I don't believe we went into that in the summary judgment record. Who were the plan administrators? The plan administrators, I believe, were a third party, and I believe it was Trotter. It was first, I think, SEHR, S-E-H-R, and then at some point it changed to Trotter. So there was a third party administrator involved in regard to it. But they don't have the authority to change the terms of the plan unilaterally. Only in conjunction with Flambeau. Correct. That is correct. Thank you. One thing I wanted to ask you about, Mr. Titullio, you have emphasized that the company would not have had or did not have access to individual employees' medical results and questionnaires. Correct. Is that a requirement of your legal position or of some independent statutory requirement, or is that the company's good grace on this? When the company decided to implement a wellness program, they recognized that there was protections that employees are due under the ADA. And because of that, they purposely structured it, as most wellness programs are structured in this country, it wasn't anything unique to Flambeau, to make sure that they were insulated from the individual information. I understand that. Okay. Good reasons for that. My question is, is that, under your legal theory, a requirement for the plan to be lawful, or is it something the company just did because it's the right thing to do? Because that makes a difference for the way we deal with these issues. I definitely think the latter is true. They did it because the company thought it was the right thing to do. There's no doubt in my mind about that. And I think within the context of the facts and circumstances here of how carefully they went into establishing the wellness program, that that is consistent with my client's conduct. From a legal analysis standpoint, is it a requirement? I would think that it's a requirement. Based on? Based on, in part, maybe the subterfuge part of this. And what I mean by that is the safe harbor has the subterfuge aspect, which basically says you can have the safe harbor. It's important to have the safe harbor. But the subterfuge is a check on that. And from a legal perspective, I would not want my client to have access, or any company for that matter, to have access to individual information because I think it's susceptible to. You know, the company, high-level management might have every indication and intent to honor the confidentiality of that and not use it. But if it's open to others in the company, maybe lower-level management, maybe somebody uses it improperly. So I think from a legal standpoint as well, it is required. Well, my earlier question is where can a person, an employee, get access to the test that was taken? They were given information as to who held the information. And who held it? It was a third-party administrator. It was the HR department. And so it's confined to that. Correct. And that where I assume no one can get to it except the individual person. That is absolutely correct. That is 100% correct. I also want to address, because there were some questions about this, the EEOC's authority in regard to rulemaking in this case. Our position is that the rulemaking authority has been exceeded here by the EEOC. If you look at the ADA, and let's start with the ADA, and then we have to look at the Affordable Care Act as well. Under the ADA, Subchapter 1 is clearly within the jurisdiction of the EEOC to promulgate regulations. No question about that. Subchapter 2 is the Attorney General. Subchapter 3, I believe, is the Department of Transportation, if I recall correctly. Subchapter 4, one thing that is clear is that the EEOC does not have rulemaking authority under Subchapter 4. And that's where the safe harbor provision is located. Who does have the jurisdiction for that? I'm not positive on that. It's not the EEOC. Is it HHS? It might be. My guess is because the safe harbor is really an insurance type regulation, if you will, that it might be HHS. Somebody that's more informed and involved with insurance and wellness programs, which leads to, is probably, under the Affordable Care Act, it's clear that there are three agencies, federal agencies, that can promulgate regulations. HHS, the Department of Treasury, and I always forget the third one. But there's a third one. Department of Labor. How can I forget the Department of Labor? So, in all likelihood, that one of them, particularly HHS, which has more, and the Department of Labor, for that matter, have more knowledge about insurance, I would think that one of them, one of those agencies, would be the ones that could promulgate regulations in this area. One other issue is in regard to the deference that this court owes to the EEOC, if any. Our argument is that you don't owe any deference to the EEOC's interpretation of the statute. And the primary reason for that is, again, words matter. Going back to that phrase, words do matter. And there's a plain meaning in the statute. It's absolutely clear that, although the EEOC asserts that the safe harbor is wholly inapplicable to 42 U.S.C. 12-112-D, which is basically the wellness testing, but the fact is the safe harbor explicitly provides that it applies to Title I of the ADA. Safe harbor is absolutely undisputedly clear on that. And then Section 12-112 is clearly contained within Title I of the ADA. So, again, I go back to the plain meaning of the statute. And given the plain meaning of the statute and also the questionable regulatory authority here, I do not believe in Flambeau's position is that this court owes any deference to the EEOC in regards to the safe harbor. I can see I'm almost out of time. I would be happy to answer any other questions. Just one point of interest for me. Flambeau's in the plastics industry? That's correct. Is there any evidence that the plan they adopted is one unique to that industry and whatever associated risks that are attended? Not that I'm aware of, and I don't believe there's anything in the record to that effect either, Your Honor. Thank you. In closing, I would just again respectfully request that this court affirm the district court's well-reasoned holding in this case. Thank you. Your Honor, many points were raised, and if you have questions I can answer them or I can go to respond to two or three different points that my opposing counsel made. And one is about eligibility versus enrollment. Flambeau had tried to argue that the summary plan description, even though it didn't have as a term of eligibility enrollment in the wellness plan, that somehow this was an enrollment mechanism and it could just add it on. I think you're correct. ERISA requires terms of eligibility to be in the summary plan description, and they're not there. And also, I think that there's a question of fact on this record, whether it was even a term of enrollment, because the company told Mr. Arnold that he could enroll on the health insurance plan without doing the wellness plan if he wanted to pay 100% of the premiums. And in that respect, Your Honor, I thought this case, I believe this case is like Seth's case, where they had to pay a surcharge, but they could still be part of the health insurance plan without doing the wellness. Now, as for our rulemaking authority under Title V of the Americans with Disabilities Act, we continue to believe that we have the authority to interpret it, and that's because the insurance safe harbor explicitly refers to Subchapter 1, which we do have the authority to interpret. The EEOC has also interpreted other parts of the ADA falling under Title V, including the retaliation provision. We have interpretive guidance and regulations about that. So it's not such a crazy idea that the EEOC thinks that it has the authority to issue regulations interpreting the insurance safe harbor provision. And just to tell you, the Department of Justice also has a regulation that parrots the insurance safe harbor provision, since they have the authority, too, under Title V of the ADA. If I could just follow up on a question Judge Flom asked earlier concerning this underwriting issue, could you address the point the defense raised about the role of tobacco use and the way information was used relevant to tobacco use for setting premiums and coverage issues? Well, as I stated before, the record shows that they were doing that prior to making the plan mandatory, so they weren't making the decision to charge smokers a higher premium rate. They could review that every year, though, couldn't they? Potentially. Perhaps that they could review that every year, but they're not making decisions about they're not refusing to cover smokers, they're only charging them a higher premium rate, and that that's not underwriting, administering risk, or classifying risk. That's underwriting. That's setting a higher rate. And I assume you don't want them to cut off all health insurance for smokers. No, and they are allowed to charge smokers a higher premium rate. And my last question is, would this court like us to submit a brief or a letter about the jurisdiction of this court? Yeah, we'll permit and direct that both sides submit within 10 days a statement on jurisdiction. Thank you, Your Honors. Thank you. Thanks to both counsel.